IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| I.T., by and through his parents Renee and Floyd T., | ) ) ) | CIVIL NO. 11-00676 LEK-KSC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**ORDER AFFIRMING IN PART AND VACATING IN PART**
**THE HEARINGS OFFICER'S OCTOBER 6, 2011 DECISION**

Before the Court is an appeal by Plaintiffs I.T.
("Student"), by and through his parents Renee and Floyd T.[1]
("Plaintiffs"), of the Administrative Hearings Officer's
("Hearings Officer") October 6, 2011 Findings of Fact,
Conclusions of Law and Decision ("Decision").  Plaintiffs filed
their Opening Brief in the instant case on March 12, 2012.
Defendant the Department of Education, State of Hawai`i
("Defendant" or "the DOE") filed its Answering Brief on April 26,
2012, and Plaintiffs filed their Reply Brief on May 10, 2012.
The Court heard oral argument in this matter on June 25, 2012.
Appearing on behalf of Plaintiffs was John Dellera, Esq., and
appearing on behalf of Defendant was James Raymond, Esq.  After

---

[1] The Court will refer to Renee T. as "Mother" and to Renee
T. and Floyd T. collectively as "Parents".

careful consideration of the briefs, the arguments of counsel, and the relevant legal authority, the Decision is HEREBY AFFIRMED IN PART AND VACATED IN PART for the reasons set forth below. The Decision is VACATED insofar as the Court CONCLUDES that: 1) Defendant violated the Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by failing to evaluate Student for a suspected auditory processing disorder, although this violation did not deny Student a Free Appropriate Public Education ("FAPE") because the evidence ultimately established that he did not have the disorder; and 2) Defendant denied Student a FAPE by failing to address his speech/language needs until formulation of the August 23, 2010 Individualized Education Programs ("IEP"). The Court GRANTS Plaintiffs' request for compensatory education as a remedy for the denial of FAPE. The Decision is AFFIRMED in all other respects.

## BACKGROUND

## I.   Factual and Administrative Background

At the time of the Decision, Student was ten years old and in the sixth grade at Loveland Academy ("Loveland"). He has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), combined type, mixed receptive-expressive language disorder, reading order, dyslexia, and a generalized anxiety disorder. Student's home school is Kaleiopuu Elementary School ("Home School"), which he attended from pre-school to the 2009-

2010 school year, when he was in the fourth grade. Student began attending Loveland in mid-July 2010, and he officially enrolled there in November 2010. [Decision at 1, 4.[2]]

On February 24, 2011, Plaintiffs filed their Request for Impartial Due Process Hearing ("RIH") with the DOE. [Administrative Record on Appeal ("ROA") at 4-7.] The RIH asserts, *inter alia*, that Student's March 3, 2009 IEP, February 22, 2010 IEP, and August 23, 2010 IEP[3] (collectively "the Contested IEPs") denied Student a FAPE and that the DOE refused to acknowledge or address Student's mental health/behavioral issues. [Id. at 6.]

The RIH sought the following:

1. A finding that the March 3, 2009, February 22, 2010, and May 26, 2010, June 22, 2010 and August 23, 2010 (collectively, "August 23, 2010") IEPs do not offer FAPE to [Student] and the DOE has not provided appropriate services necessary for him to obtain a meaningful benefit in the public school for the 2009-2010 and 2010-2011 school years;

2. A finding that the DOE committed procedural and substantive violations of the IDEA;

3. Reimbursement to Petitioners and/or payment to Loveland Academy for school tuition and

---

[2] The Decision is Exhibit 20 to the Administrative Record on Appeal at 177-200. The Decision states that Student was not enrolled at Loveland until November 2011, but this appears to be a typographical error. [Decision at 4.]

[3] Student's IEP team formulated the August 23, 2010 IEP at three meetings held on May 26, 2010, June 22, 2010, and August 23, 2010. [Decision at 20.]

related service expenses, including
transportation, at Loveland Academy for the
extended school year 2010, 2010-2011 school
year, and extended school year 2011 pursuant
to 20 U.S.C. 1412(a)(10((C)(iii) [sic];

4.     [Student] requests multi-sensory reading and
math instruction and afternoon tutoring in
reading and math;

5.     [Student] needs an increase in his speech
therapy services provided by a qualified
speech language pathologist;

6.     A Functional Behavioral Assessment needs to
be conducted and Behavioral Support Plan
needs to be completed and implemented;

7.     [Student] requires mental health services
available to him throughout his school day;

8.     [Student] requires an appropriate afterschool
program . . . ;

9.     Reimbursement and/or payment for the
psychological evaluation conducted by Karen
Tyson, Psy.D.;

10.    Compensatory education;

11.    Attorneys' fees and costs.

[Id. at 6-7.]

The Hearings Officer convened the due process hearing

on July 25, 2011, and the evidentiary portion of the hearing

continued on July 26, 27, and 28, 2011.  The parties filed

written closing arguments.  [Decision at 3-4.]

The Hearings Officer framed the issues presented in the

RIH as whether the Contested IEPs:

-      failed to adequately detail Student's

strengths and needs in the PLEPs,[4] and that many of the goals and objective were inadequate or inappropriate;

-    offered services that were not appropriate or not properly implemented;

-    failed to acknowledge or address Student's mental health or behavioral issues; and

-    offered services in the DOE public school setting that were not appropriate for Student to obtain meaningful benefit for the 2009-2010, and 2010-2011 school years.

[Id. at 13-14.]

A.    **March 3, 2009 IEP**

As to the appropriateness of the program and placement offered in the March 3, 2009 IEP, the Hearings Officer concluded as follows:

Petitioners contend that the DOE failed to assess Student's possible auditory processing disorder. Psychologist P.M.'s[5] February 2009 report mentions that [Central Auditory Processing Disorder ("CAPD")] should be ruled out. However, at the time the March 3, 2009 IEP was developed, Mother admitted that she had not provided the IEP team with psychologist P.M.'s report.

.   .   .   .

The Hearings Officer concludes that Petitioners have not shown that the DOE had sufficient information about Student having a CAPD to have a duty to conduct a CAPD evaluation for the March 3, 2009 IEP. The DOE can not [sic] be expected to consider a report that it had not

---

4 "PLEPs" are the Present Levels of Educational Performance.

5 The Decision refers to Peggy Murphy-Hazzard, Ph.D. as "psychologist P.M." [Decision at 2.]

received. Additionally, as evidenced by the
March 3, 2009 [Prior Written Notice ("PWN")], the
DOE was willing to consider psychologist P.M.'s
report once it was received.

Further, Respondent presented evidence that
an auditory processing disorder evaluation was not
needed. As testified by the SSC,[6] the DOE
audiologist had opined that there was no need for
Student to have an auditory processing evaluation.
Additionally, parental consent is needed before an
auditory processing evaluation can be done. No
parental consent for an auditory processing
evaluation was given.

Petitioners next contend that the March 3,
2009 IEP did not address Student's behaviors. In
their Request, Petitioners state that Student's,
[sic] "behaviors occur several times a day".
However, special education teacher G.M.[7]
testified that Student progressed in all areas
during his 3rd grade school year at the home
school that needed to be addressed. The Hearings
Officer concludes that Petitioners have not shown
that Student exhibited behaviors at the home
school that needed to be addressed.

[Id. at 16-17.]

In addition, the Hearings Officer also concluded that:

•Student's PLEPs were appropriate, even though they did not
    address Student's behaviors, because there were no areas of
    behavioral concern;

•the goals and objectives were appropriate, even though they did
    not address Student's alleged speech and communication
    difficulties, because the DOE conducted a speech/language
    assessment in February 2009, and Student's March 3, 2009 IEP
    stated that the IEP team would amend the IEP to add language
    services after the team received Dr. Murphy-Hazzard's

---

[6] The Decision refers to Traciann Dolim, the student
services coordinator, as the "SSC". [Id. at 1.]

[7] The Decision refers to Glorilynn Manding as "special
education teacher G.M." [Id.]

report;

- Student did not need speech/language services at the time the IEP team formulated the March 3, 2009 IEP because he could "functionally communicate" and he could perform even challenging tasks after verbal prompts; and

- the March 3, 2009 IEP offered an appropriate placement in the least restrictive environment.

[Id. at 17-18.]

### B. February 26, 2010 IEP

As to the appropriateness of the program and placement offered in the February 26, 2009 IEP, the Hearings Officer concluded as follows:

> At the time the February 26, 2010 IEP was created, the DOE had psychologist P.M.'s report that recommended CAPD be ruled out. However, psychologist P.M. did not testify, and there was no explanation why CAPD should be ruled out. In fact, psychologist P.M.'s report of a BioMAP test implies that Student did not have an auditory processing disorder.

> In their rebuttal brief, Petitioners argue that the DOE has a duty to evaluate when the DOE has a reason to suspect a disability. However, the Hearings Officer concludes that, because Student had not manifested any need for a CAPD evaluation in the 5 previous years he had attended the home school, the fact that psychologist P.M. mentions that CAPD should be ruled out does not place the DOE on notice that Student has a suspected disability in this area.

[Id. at 19.]

The Hearings Officer noted that Plaintiffs raised the same challenges to the February 26, 2010 IEP that they raised to the March 3, 2009 IEP. Mother, however, testified that she did

not voice her disagreement with the February 26, 2010 IEP to the team because she felt like she was not allowed to participate and because her input was not included in the IEP.  In particular, the February 26, 2010 IEP did not mention that Student "shuts down" or that he has mental health needs.  [Id.]  The Hearings Officer noted that the PLEPs did reflect Mother's concerns about Student's homework.  Based on the classroom observations of Student stated in the PLEPs, his special education teacher's testimony that Student did not exhibit any behavioral problems and that Student's speech and language were not areas of concern, and Student's progress in reading, the Hearings Officer concluded that Student did not need speech/language services or behavioral interventions in the February 26, 2010 IEP.  As with the March 3, 2009 IEP, the Hearings Officer concluded that the February 26, 2010 IEP offered Student an appropriate placement in the least restrictive environment.  [Id. at 19-20.]

C.  **August 23, 2010 IEP**

As to the appropriateness of the program and placement offered in the August 23, 2010 IEP, the Hearings Officer noted that:

> Mother testified that the DOE would not consider psychologist P.M.'s report as it was too old.  However, both the SSC and special education teacher E.P.[8] testified that at the May 26, 2010

---

[8] The Decision refers to Esther Parish as "special education
(continued...)

meeting the team discussed psychologist P.M.'s
report but took the fact that it was over a year
old into consideration.  Although psychologist
P.M.'s report mentions Student's behaviors,
special education teacher E.P. testified that
behaviors and anxiety were not occurring in the
classroom.  Mother admitted that although the SSC
offered to have Student assessed for CAPD, Mother
did not provide consent for an evaluation.

The SSC further testified that besides the
evaluations, the IEP team considers how Student is
doing at the home school.

[Id. at 20.]

In addition, the Hearings Officer also concluded that

Plaintiffs failed to establish that the PLEPs in the August 23,

2010 IEP were inaccurate because:

• Student's PLEPs indicated that he was "functioning at a high
    level" and this was consistent with both his math skills and
    his fifth-grade-level ability to understand inferential
    language;

• Student's special education teacher, Ms. Parish, testified that
    he did not exhibit problem behaviors in the classroom and
    did not need mental health services; and

• Ms. Parish testified that Student progressed on his goals and
    objectives during the 2009-2010 school year.

[Id. at 21.]  Similarly, because the DOE witnesses testified that

Student did not exhibit behavioral problems at school, the

Hearings Officer rejected Plaintiffs' arguments that: the amount

of Student's special education services and the amount of

speech/language therapy were inadequate; and Student needed

---

[8](...continued)
teacher E.P."  [Decision at 1.]

9

supplemental behavioral supports, such as counseling.  The
Hearings Officer also noted that witnesses from Loveland
testified that, when Student first attended the school, he did
not exhibit behavioral problems.  The behaviors began when he was
presented more difficult tasks, but the provision of a one-to-one
skills trainer helped Student tremendously.  The Hearings Officer
therefore concluded that the DOE did not have cause to believe
that Student needed behavioral or mental health services in the
August 23, 2010 IEP.  [Id. at 21-22.]

        The Hearings Officer noted that Student's fourth grade
general education teacher testified that Student "did well,
interact[ed] with his fellow students in small groups[,] . . .
made progress during the school year and although he sometimes
struggled with his work, Student was not withdrawn or isolative."
[Id. at 22.]  The Hearings Officer also credited the testimony of
DOE speech and language pathologists that: the sixty minutes of
speech/language therapy included in the August 23, 2010 IEP was
appropriate for Student's needs; Student's communication goals
and objectives were appropriate; and the speech/language services
offered at Loveland were essentially the same as those the DOE
offered in the August 23, 2010 IEP.  The Hearings Officer
discounted the opinion of Plaintiffs' privately retained
psychologist, Karen Tyson, Psy.D., that Student's services were
not adequate and that Student needed behavioral supports, such as

counseling.  The Hearings Officer therefore concluded that
Plaintiffs had not established that the August 23, 2010 IEP
offered Student inappropriate services.  As with the other IEPs,
the Hearings Officer concluded that the August 23, 2010 IEP
offered Student an appropriate placement in the least restrictive
environment.  [Id. at 22-23.]

The Hearings Officer ultimately concluded that
Plaintiffs failed to prove that the Contested IEPs denied Student
a FAPE and that Plaintiffs failed to establish procedural
violations of the IDEA.  The Hearings Officer therefore dismissed
the RIH.  [Id. at 24.]

The instant action followed.

## II.  Plaintiffs' Opening Brief

In their Opening Brief, Plaintiffs contend that the
Hearings Officer erred in dismissing their claims that:

> (1) the educational program and placement offered
> by the Department . . . in IEPs dated March 3,
> 2009, February 26, 2010, and August 23, 2010
> denied I.T. a free appropriate public education
> ("FAPE"); (2) Defendant committed procedural
> violations of the IDEA by failing adequately to
> consider the parent's input at IEP meetings;
> (3) Defendant failed to evaluate all suspected
> disabilities; and (4) parent should be reimbursed
> for or Defendant should pay tuition at Loveland
> Academy commencing November 10, 2010 and the cost
> of the neuropsychological evaluation conducted by
> Karen Tyson dated February 19, 2011.

[Opening Br. at 1.]

Plaintiffs summarize the history of Student's receipt of services beginning with the Department of Health's Zero-to-Three program and continuing through his years at the Home School and the formulation of his IEPs. [Id. at 1-11.] In particular, Plaintiffs note that they obtained a neuropsychological evaluation by Peggy Murphy-Hazzard, Ph.D., dated February 28, 2009 ("Murphy-Hazzard Report"), which indicated, *inter alia*, that Student may have an anxiety disorder and that CAPD should be ruled out. [Id. at 3-5; ROA, Pets.' Exh. 7 at 86-97.] The IEP team, however, did not discuss the Murphy-Hazzard Report until May 26, 2010, and Student's PLEPs did not mention the report until August 23, 2010. [Opening Br. at 6 (citing ROA, Pets.' Exh. 2 at 20; 7/28/11 Hrg. Trans. (Vol. IV) at 608).] Further, as of May 26, 2010, neither Student's general education teacher nor his special education teacher had read the Murphy-Hazzard Report. [Id. at 10 (citing ROA, 7/27/11 Hrg. Trans. (Vol. III) at 582, 546, 555).]

Plaintiffs emphasize that the DOE's language assessment report of Student by Christie Iraha, dated February 18, 2009 ("Iraha Report"), indicated that he was eligible for speech/language services. [Id. at 5-6; ROA, Pets.' Exh. 4 at 69 (PWN dated March 3, 2009), Exh. 8 at 98-100 (Iraha Report).] The DOE, however, conditioned the commencement of services upon receiving the information about CAPD in the Murphy-Hazzard

12

Report. [ROA, Pets.' Exh. 4 at 69.] Thus, the IEP team did not include speech/language services in Student's IEP until August 23, 2010. [Id., Pets.' Exh. 2 at 20.]

Plaintiffs point out that Mother raised Student's communication and behavioral issues at the February 26, 2010 IEP team meeting, and she complained about Student's lack of progress. [Opening Br. at 7 (citing ROA, 7/26/11 Hrg. Trans. (Vol. II) at 359 (Mother's testimony)).] Student's fourth grade teacher, Glendene Otake, testified that he made only slight progress in his general education subjects. [Id. (citing ROA, 7/27/11 Hrg. Trans. (Vol. III) at 573-74).] Ms. Otake used a team approach in her class, involving students working in small groups. Ms. Otake observed that Student relied on other group members to do most of the work, and she testified that Student may need an educational aide to assist him. The DOE, however, did not assign Student an aide. [Id. at 7-8 (citing ROA, 7/27/11 Hrg. Trans. (Vol. III) at 571-72 (Otake's testimony); 7/26/11 Hrg. Trans. (Vol. II) at 353 (Mother's testimony)).] Mother testified that Student's self-esteem issues were aggravated by the team approach, discouraging him from participating or asking questions. [Id. at 8 (citing ROA, 7/26/11 Hrg. Trans. (Vol. II) at 353-54).]

Mother also testified that, at the end of the May 26, 2010 IEP team meeting, she notified the DOE that she would place

Student at Loveland at the DOE's expense because the DOE had not addressed his needs after all the years that she had voiced her concerns. [Id. at 10 (citing ROA, Pets.' Exh. 9 at 127; 7/26/11 Hrg. Trans. (Vol. II) at 385-86).]  On May 28, 2010, the DOE suggested another meeting to address Mother's concerns, but, while speech/language services and goals were added in the August 23, 2010 IEP, the IEP still did not address evaluating Student for CAPD or mental health issues.  [Id. at 10-11 (citing ROA, Pets.' Exh. 9 at 126 (letter dated 3/17/11 to Parents from the principal of the Home School)); ROA, Pets.' Exh. 2 (August 23, 2010 IEP).]

Mother placed Student at Loveland for assessment in July 2010, and she confirmed that fact in a letter to the DOE dated September 27, 2010.  According to Mother's testimony, the DOE acknowledged the unilateral placement on September 30, 2010, and Student officially enrolled at Loveland in November 2010. [Id. at 11 (citing ROA, 7/26/11 Hrg. Trans. (Vol. II) at 395-96; Resp.'s Exh. 17 at 187-88).]

Plaintiffs argue that the Hearings Officer erred in rejecting their claim that the DOE failed to assess Student in all areas of suspected disability because the DOE had ample reason to suspect that Student had communication and behavioral disabilities during the formulation of the Contested IEPs.  The DOE, however, failed to conduct its own evaluations and refused

to consider evaluations that Plaintiffs provided. In particular, the fact that the DOE did not have a copy of the Murphy-Hazzard Report at the March 3, 2009 IEP team meeting was not an adequate ground to ignore Mother's informed suspicions that Student may have CAPD. Plaintiffs argue that the failure to evaluate that suspected disability prevented the team from developing an IEP that was reasonably calculated to provide Student with a meaningful educational benefit. [Id. at 17-19.] Plaintiffs also assert that the Hearings Officer erred in concluding that Student did not need mental health services. The fact that his teachers did not observe mental health issues does not mean that none existed. [Id. at 21-22.]

Plaintiffs argue that the Contested IEPs did not offer Student a FAPE because: the goals and objectives were not appropriate; they did not address his communication needs and behavioral needs; and Student lost educational benefits because his IEPs were not appropriate. [Id. at 25-32.] Insofar as Plaintiffs contend that the DOE denied Student a FAPE, they ask the Court to award reimbursement for Student's placement at Loveland, which Plaintiffs contend is a proper placement for Student. [Id. at 32-34.] In addition, they ask the Court to award compensatory education to remedy the denial of FAPE. [Id. at 34-35.]

Plaintiffs therefore urge the Court to vacate the
Decision and to enter judgment in their favor awarding them:
Student's tuition and related costs at Loveland from November 10,
2010 until his placement is legally changed; reimbursement for
the evaluations conducted by Dr. Murphy-Hazzard and Dr. Tyson;
and reasonable attorneys' fees and costs.  [Id. at 36.]

### III. Defendant's Answering Brief

In its Answering Brief, the DOE urges the Court to
affirm the Hearings Officer's Decision.  The DOE argues that the
Court should afford considerable deference to the Decision
because the Hearings Officer: carefully considered and weighed
the evidence; provided detailed analysis in the Decision of the
facts and the law; was fully engaged in the evidentiary hearing;
clarified issues and carefully considered counsel's objections at
the hearing; and was in the best position to weigh testimony and
assess the witnesses' credibility.  [Answering Br. at 7.]

As to the failure to evaluate Student's suspected CAPD,
the DOE argues that the Hearings Officer correctly concluded that
the DOE did not have enough information during the formulation of
the March 3, 2009 IEP to trigger a duty to evaluate Student for
CAPD.  The DOE argues that the statement in the March 3, 2009 IEP
that the team would amend the IEP to add language services upon
receipt of the Murphy-Hazzard report was an appropriate response.
[Id. at 8-9.]  The DOE notes that the IEP team did have the

Murphy-Hazzard Report at the February 26, 2010 team meeting, but the DOE argues that the report did not conclusively indicate CAPD. The DOE emphasizes that, when a parent presents an independent educational evaluation ("IEE"), the DOE is only required to consider its results, and the DOE is not bound by the conclusions therein. [Id. at 9 (citing 34 C.F.R. § 300.502(c)(1); Haw. Admin. R. § 8-60-57(c)(1)).] Further, on June 22, 2010, the IEP team reviewed the Murphy-Hazzard Report and agreed to send it with the DOE's speech/language assessment to an audiologist to get a recommendation on whether an assessment for CAPD was warranted. [Id. at 10 (citing ROA, 7/28/11 Hrg. Trans. (Vol. IV) at 622).] Defendant argues that Plaintiffs failed to meet their burden of proof on this issue because the evidence ultimately established that Student does not have an auditory processing disorder. [Id. (citing ROA, 7/26/11 Hrg. Trans. (Vol. II) at 267).]

As to Plaintiffs' argument that the DOE failed to evaluate Student for suspected mental health issues, the DOE argues that the IEP team properly considered the Murphy-Hazzard Report's findings about possible mental health issues as well as input from Mother, Student's advocate, and Student's teachers, but the team ultimately determined that Student did not require mental health services. [Id. at 11.]

As to the alleged denial of parental participation, the DOE argues that this Court should not consider the issue because Plaintiffs did not raise it in the RIH and the Hearings Officer did not rule on it. If this Court does decide to consider the issue, the Court should reject Plaintiffs' argument because the record is full of examples of Mother's participation in the IEP formulation process. [Id. at 17.]

As to the goals and objectives in the Contested IEPs, the DOE emphasizes that the IEP team ultimately determines the goals and objectives, which may not necessarily reflect what a student's parents contend the student needs. [Id. at 19.] Student's care coordinators testified that, in general, a student's PLEPs are based upon classroom assessments, standardized assessments, performance in the classroom, and writing samples, in addition to information from the student's parents. Thus, having considered all of the relevant information, the IEP team determined that Student did not require mental health services, and the team did not have to adopt mental health goals. [Id. at 20 (citing ROA, 7/27/11 Hrg. Trans. (Vol. III) at 473, 476-77, 507-09).] For similar reasons, the IEP team did not have to adopt goals and objectives addressing CAPD. [Id. at 21.]

As to Plaintiffs' argument that the Contested IEPs did not provide sufficient speech/language services for Student's

needs, the DOE argues that Plaintiffs are demanding the absolute best educational program, which the DOE is not required to provide. [Id. at 21-22.] The DOE acknowledges that the Iraha Report in February 2009 indicated that Student would benefit from language services, but the services were not included in the March 3, 2009 IEP. The DOE states that there were several factors contributing to the delay, one of which was that the team was expecting Plaintiffs to provide the Murphy-Hazzard Report after the March 3, 2009 meeting. [Id. at 22.] At the hearing, Ms. Iraha and the DOE speech and language pathologist both testified that the delay in implementing the language services had minimal impact on Student because he had functional communication skills. [Id. at 22-23 (citing ROA, 7/28/11 Hrg. Trans. (Vol. IV) at 597-98, 612).] The DOE also argues that Student's educational progress during the fourth grade also indicated that the delay had minimal impact. [Id. at 23-24 (citing ROA, 7/27/11 Hrg. Trans. (Vol. III) at 537, 573-74; Resp.'s Exh. 11).] The DOE therefore contends that, in spite of the delay in providing services, the Contested IEPs were reasonably calculated to enable Student to receive educational benefits. [Id. at 25.]

The DOE also argues that Student did obtain educational benefits at the Home School during the years at issue. Ms. Manding, Ms. Otake, and Ms. Parish testified that Student

made progress, and DOE psychologist, Renee Bergeron, Ph.D.,
testified that, based on her review of Student's records and her
interviews with Student's teachers, she could not agree with
Dr. Tyson's conclusion that Student had not obtained sufficient
benefits from his education.  [Id. at 25-26 (citing ROA, 7/27/11
Hrg. Trans. (Vol. III) at 489-90, 534, 573-74; 7/28/11 Hrg.
Trans. (Vol. IV) at 640; Resp.'s Exh. 11).]  The DOE argues that
the Court should defer to the Hearings Officer's credibility
determinations and affirm the Hearings Officer's findings that
Student received educational benefits during the third and fourth
grade at the Home School.  [Id. at 27.]

     The DOE argues that this Court need not reach the issue
of reimbursement for Loveland expenses because Plaintiffs have
not established that Student was denied a FAPE.  If the Court
does address the issue, the Court should find that Loveland was
not an appropriate placement for Student for the 2010-2011 school
year because: his behavior actually deteriorated when he enrolled
there; the speech/language services Student receives at Loveland
are not properly supervised; programs such as Loveland's
Biopsychosocial Rehabilitation have no educational value; and the
mental health services there are not evidence-based treatments.
[Id. at 27-31.]  Even if this Court determines that Loveland was
an appropriate placement, the DOE argues that the tuition and
related costs of Loveland are unreasonable and that the Court

should only authorize payment for services specifically ordered in this Court's decision. [Id. at 31-34.]

Finally, the DOE argues that Plaintiffs are not entitled to either compensatory education or reimbursement for the evaluations by Dr. Murphy-Hazzard and Dr. Tyson. The DOE contends that Student is not entitled to compensatory education because he was not harmed by any violation of the IDEA. The DOE argues that this Court cannot consider Plaintiffs' request for expenses for the Murphy-Hazzard Report because Plaintiffs did not include that request in the RIH. Further, Plaintiffs did not properly raise this issue in the Opening Brief. They only mention the request in passing in the conclusion. The DOE argues that Plaintiffs are not entitled to reimbursement for Dr. Tyson's evaluation because there is no evidence that Plaintiffs requested an IEE because they disagreed with a DOE assessment, or that the DOE failed to provide or denied the requested IEE. The DOE also argues that Plaintiffs did not properly raise this issue in the Opening Brief. [Id. at 34-37.]

The DOE therefore urges the Court to affirm the Decision in its entirety.

## IV. __Plaintiffs' Reply Brief__

In their Reply Brief, Plaintiffs emphasize that the IEP team did not add language services upon receiving the Murphy-Hazzard Report, which raised the issue of Student's suspected

CAPD. The IEP team did not consider the report until after Mother notified the DOE of her intent to place Student at Loveland. Plaintiffs argue that the Murphy-Hazzard Report conclusively stated that Student should be evaluated for CAPD. Further, the fact that Plaintiffs obtained a private assessment did not excuse the DOE from conducting its own assessment based on Mother's informed suspicions of Student's CAPD. [Reply Br. at 1-2.] Plaintiffs raise the same arguments with regard to the mental health issues indicated in the Murphy-Hazzard Report. Plaintiffs also contend that the DOE was required to consider Student's behavioral problems outside of school, not just his behavior in the classroom. [Id. at 3-4.]

As to the delay in providing speech/language services, which the DOE's Iraha Report indicated Student needed, Plaintiffs argue that the DOE has not presented any justification for the delay. They assert that Student lost a year-and-a-half of special education and related services as a result. [Id. at 4.]

As to the issue of Mother's participation, Plaintiffs assert that they raised the issue in the RIH by stating that the DOE failed to take action despite being told of Student's needs. [Id. at 5 (citing ROA, Pets.' Exh. 1 at 3).] Plaintiffs also point out that their Opening Brief identified evidence presented to the Hearing Officer that Mother raised concerns at the IEP team meetings, but the team did not address her concerns. [Id.

22

at 5.]

Plaintiffs reiterate that the Contested IEPs were inadequate because they did not address Student's communication and behavioral disorders. Plaintiffs argue that the failure to include speech/language services in the IEP for a year-and-a-half denied Student a basic floor of opportunity. Plaintiffs emphasize the evidence identified in the Opening Brief that Student only made trivial educational progress during the third and fourth grades. Plaintiffs therefore argue that Student did not obtain an educational benefit and that the Hearings Officer erred in concluding that the Contested IEPs offered a FAPE. [Id. at 6-10.]

As to the DOE's argument that Loveland is not an appropriate placement, Plaintiffs argue that Student exhibited the behavioral problems which occurred at Loveland prior to his transfer there and that Mother reported those problems to the IEP team. Further, Plaintiffs emphasize that Student has made meaningful educational progress at Loveland. [Id. at 10.] Plaintiffs argue that Loveland does not have to meet state school or licensing standards for Plaintiffs to obtain reimbursement. [Id. at 11 (citing Florence Co. S.D. v. Carter, 510 U.S. 7, 14 (1993)).] Plaintiffs also argue that the DOE has not presented any evidence proving that the tuition and costs at Loveland are unreasonable. [Id. at 11.]

Plaintiffs argue that they have shown that they are entitled to compensatory education for the failure to implement language services for one-and-a-half years, the failure to assess Student for all areas of suspected disability, and the failure to address all of Student's needs. Plaintiffs argue that the DOE's failure to provide necessary services is sufficient proof that Student lost educational opportunities. [Id. at 16-17.]

Finally, Plaintiffs argue that they are entitled to reimbursement for both the Murphy-Hazzard Report and Dr. Tyson's evaluation and that they sufficiently raised both issues in the Opening Brief. Plaintiffs state that the Murphy-Hazzard Report was an independent evaluation under 34 C.F.R. § 300.502 and that they had to obtain the Tyson evaluation because the DOE complained that the Murphy-Hazzard Report was old. Plaintiffs acknowledge that they did not request an IEE, but they argue that the DOE should not be rewarded for failing to evaluate Student's suspected disabilities. [Id. at 17-18.]

**STANDARDS**

## I.   **IDEA Overview**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs." Hoeft ex rel. Hoeft v. Tuscon Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing

<u>Honig v. Doe</u>, 484 U.S. 305, 310, 108 S. Ct. 592, 597, 98 L. Ed. 2d 686 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]"  20 U.S.C. § 1400(d)(1)(A).

The IDEA defines FAPE as

> special education and related services that –
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP.  <u>See generally</u> 20 U.S.C. § 1414.  The IEP is to be developed by an "IEP Team" composed of, *inter alia*, school officials, parents, teachers and other persons knowledgeable about the child. § 1414(d)(1)(B).

"Procedural flaws in the IEP process do not always amount to the denial of a FAPE."  <u>L.M. v. Capistrano Unified Sch.</u>

<u>Dist.</u>, 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted).

Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child." <u>Id.</u> (citations omitted). "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." <u>Id.</u> (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education. <u>J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.</u>, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). Rather, school districts are required to provide only a "'basic floor of opportunity.'" <u>Id.</u> (quoting <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 201 (1982)). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." <u>Id.</u> at 433 (citations and quotation marks omitted).

If a parent disagrees with the contents of an IEP, the parent may challenge the contents thereof by demanding an administrative due process hearing to be conducted by the local or state educational agency. <u>See</u> 20 U.S.C. § 1415(b)(6),

(f)(1)(A).  Parents may also send their student to a private

program and seek retroactive tuition reimbursement from the

state.  <u>Forest Grove Sch. Dist. v. T.A.</u>, 557 U.S. 230, 246-74

(2009) (citations omitted).  Where parents unilaterally withdraw

a child from public school, they "do so at their own financial

risk."  <u>Id.</u> at 247 (citations and quotation marks omitted).

Parents challenging an IEP are entitled to reimbursement only if

"a federal court concludes both that the public placement

violated IDEA and the private school placement was proper under

the Act."  <u>Id.</u> at 246 (citation and quotation marks omitted); <u>see</u>

<u>also</u> 34 C.F.R. § 300.148(c).

## II.  <u>Standard of Review</u>

The standard for district court review of an

administrative decision under the IDEA is set forth in 20 U.S.C.

§ 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the
> court –
>> (i) shall receive the records of the
>> administrative proceedings;
>> (ii) shall hear additional evidence at the
>> request of a party; and
>> (iii) basing its decision on the
>> preponderance of the evidence, shall grant
>> such relief as the court determines is
>> appropriate.

This standard requires that the district court give "'due

weight'" to the administrative proceedings.  <u>L.M.</u>, 556 F.3d at

908 (quoting <u>Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist.</u>

<u>v. Rowley</u>, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690

(1982)) (some citations omitted).  The district court, however,

has the discretion to determine the amount of deference it will

accord the administrative ruling.  <u>J.W.</u>, 626 F.3d at 438 (citing

<u>Gregory K. v. Longview Sch. Dist.</u>, 811 F.2d 1307, 1311 (9th Cir.

1987)).  In reaching that determination, the court should

consider the thoroughness of the hearings officer's findings,

increasing the degree of deference where said findings are

"'thorough and careful.'"  <u>L.M.</u>, 556 F.3d at 908 (quoting

<u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 892

(9th Cir. 1995)).  The district court should give "substantial

weight" to the hearings officer's decision when the decision

"evinces his careful, impartial consideration of all the evidence

and demonstrates his sensitivity to the complexity of the issues

presented."  <u>Cnty. of San Diego v. Cal. Special Educ. Hearing</u>

<u>Office</u>, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation and

quotation marks omitted)).  Such deference is appropriate because

"if the district court tried the case anew, the work of the

hearing officer would not receive 'due weight,' and would be

largely wasted."  <u>Wartenberg</u>, 59 F.3d at 891.  "[T]he ultimate

determination of whether an IEP was appropriate," however, "is

reviewed <u>de novo</u>."  <u>A.M. ex rel. Marshall v. Monrovia Unified</u>

<u>Sch. Dist.</u>, 627 F.3d 773, 778 (9th Cir. 2010) (citing <u>Wartenberg</u>,

59 F.3d at 891).

A court's inquiry in reviewing IDEA administrative decisions is twofold:

> "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" [Rowley, 458 U.S. at 206-07] (footnotes omitted).  "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  Id. at 207.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947 (9th Cir. 2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling.  Hood v. Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007) (citations omitted).  The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed.  J.W., 626 F.3d at 438 (citation omitted).

## DISCUSSION

As a general matter, the Court FINDS that the Hearings Officer's findings and conclusions are "thorough and careful" and therefore entitled to increased deference, with some exceptions noted below.  See L.M., 556 F.3d at 908 (citation and internal quotation marks omitted).  The Hearings Officer summarized the testimony of, *inter alia*, Mother, Student's teachers, and other DOE staff, and created a detailed decision explaining his factual findings and legal conclusions.  He made specific findings of

fact with respect to each of the Contested IEPs.

I. **Scope of the Decision & Scope of Review**

At the outset, this Court must determine whether all of the issues that Plaintiffs raise in their Opening Brief are properly before this Court.

Defendant contends that Plaintiffs' RIH did not raise the claim that Defendant's failure to consider and act upon the concerns that Mother raised at the IEP team meetings constituted a denial of her right to participate in the IEP formulation process. This Court agrees. Although the RIH alleges that, "[d]espite being told of [Student's] mental health/behavioral issues, the DOE has refused to acknowledge or address these needs[,]" [ROA at 6,] this was not sufficient to state a claim that Defendant denied Mother's right to participate in the IEP formulation process. The IEP team's ultimate disagreement with Mother on the issue whether Student needed mental health/behavioral services does not, in and of itself, constitute a denial of Mother's right to participate. See, e.g., Ms. S. ex rel. G. v. Vashon Island Sch. Dist., 337 F.3d 1115, 1131 (9th Cir. 2003) (recognizing that, although a school district must develop an IEP with "meaningful parental participation," a school district "has no obligation to grant [a parent] a veto over any individual IEP provision"), *superseded by statute on other grounds*, 20 U.S.C. § 1414(d). Insofar as Plaintiffs' RIH did not

specifically raise the claim that Defendant denied Mother her right to participate, the Hearings Officer could not consider the issue. See 20 U.S.C. § 1415(f)(3)(B) ("The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise."); see also Haw. Admin. R. § 8-60-65(d) (same). This Court therefore CONCLUDES that Plaintiffs' claim alleging the denial of participation is not properly before this Court, and this Court will not address that issue in the first instance.

In addition, Plaintiffs' RIH only requests reimbursement and/or payment for the Tyson Evaluation; [ROA, Pets.' Exh. 1 at 7;] it does not request reimbursement of Plaintiffs' costs to obtain the Murphy-Hazzard Report. The Hearings Officer therefore could not consider the request regarding the Murphy-Hazzard Report, and Plaintiffs' request is not properly before this Court. See § 1415(f)(3)(B); § 8-60-65(d).

The Court now turns to the merits of the claims that are properly before the Court.

## II. **Duty to Assess in All Areas of Suspected Disability**

Plaintiffs argue that the DOE's failure to evaluate Student's "communication and behavioral disabilities" violated the DOE's duty to assess Student in all areas of suspected

disability.  [Opening Br. at 17-18.]

Section 1414 states, in pertinent part:

(a)  Evaluations, parental consent, and reevaluations

. . . .

(2)  Reevaluations

(A)  In general

A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c)--

(i) if the local educational agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(ii) if the child's parents or teacher requests a reevaluation.

. . . .

(b) Evaluation procedures

. . . .

(3) Additional requirements

Each local educational agency shall ensure that--

. . . .

(B)  the child is assessed in all areas of suspected disability[.]

20 U.S.C. § 1414(a), (b).  Plaintiffs argue that Defendant had ample reasons to suspect that Student had additional

communication and behavioral disabilities beyond the disabilities reflected in his prior IEPs.

### A. Suspicion of CAPD

The Murphy-Hazzard Report stated that data from Student's auditory processing test, intelligence scale, and other sources, including Student's history of language delays in early childhood, "strongly suggest the presence of a receptive language impairment." [ROA, Pets.' Exh. 7 at 92.] In her ultimate diagnosis, Dr. Murphy-Hazzard wrote that CAPD should be ruled out. [Id. at 96.] The Murphy-Hazzard Report also noted that BioMAP testing[9] by Yusnita Weirather, Au.D., on December 29, 2008 indicated that Student's hearing in both ears was normal, as was Student's "neural encoding of speech in the auditory pathway[,]" but that "these findings do not suggest a rule out for other auditory processing disorders, meaning that [Dr. Weirather's] findings were inconclusive." [Id.] Further, the Murphy-Hazzard Report stated that Mother's reports about Student's anxious behaviors were consistent with Student's behavior during Dr. Murphy-Hazzard's testing. The report states that "[i]t is not uncommon for children with auditory processing problems and/or learning disorders to experience a high degree of

---

[9] "BioMaAP testing is a neurophysiological test used to identify deficits in processing sounds associated with learning impairments and auditory processing disorders in children." [ROA, Pets.' Exh. 7 at 92.]

anxiety." [Id. at 94.] Student also displayed a "significant weakness" in the comprehension subtest of the intelligence scale, and Dr. Murphy-Hazzard noted that "[i]t is not uncommon for children who have been diagnosed with auditory processing impairments to score poorly on this subtest." [Id. at 88.]

Although the date of the Murphy-Hazzard Report is February 28, 2009, Dr. Murphy-Hazzard conducted the testing for the report on four dates in November 2008. [Id. at 86.] Plaintiffs apparently reported Dr. Murphy-Hazzard's concerns about CAPD to the IEP team before the completion of the Murphy-Hazzard Report because the DOE's January 29, 2009 PWN states that the DOE was going to perform a language assessment because of, inter alia, a "[p]ossibility of auditory processing. Private physician report to come." [ROA, Resp.'s Exh. 7 at 80.] DOE speech and language pathologist Christie Iraha testified that the SSC asked her to perform the language assessment, which Ms. Iraha did on February 6, 2009. [ROA, 7/28/11 Hrg. Trans. (Vol. IV) at 589, 592.] The Iraha Report, dated February 18, 2009, did not specifically address the possibility of an auditory processing disorder. [ROA, Pets.' Exh. 8.] The Iraha Report, however, concluded that Student "could possibly benefit from supplemental services addressing his overall language needs (specifically listening comprehension and oral expression)." [Id. at 100.]

The DOE's PWN dated March 3, 2009 states, in pertinent part: "Language Assessment was given and [Student] does qualify for services. Upon receiving information from private doctor regarding CAP[D] we will amend [Student's] IEP and start lang[uage] services."[10] [ROA, Pets.' Exh. 4 at 69.] This statement is evidence that the DOE: 1) was aware of Student's possible CAPD diagnosis; and 2) recognized that information about that potential disability was necessary to the formulation of his IEP, even though Plaintiffs had not yet provided the IEP team with the Murphy-Hazzard Report. The Court therefore finds that the information available to the DOE by the March 3, 2009 IEP team meeting triggered the DOE's duty to assess Student for CAPD as an area of suspected disability.

The Ninth Circuit has held that a parent's privately obtained evaluation of a student does not absolve the school district of its obligation to assess the student. In <u>N.B. v. Hellgate Elementary School District, ex rel. Board of Directors, Missoula County, Montana</u>, the Ninth Circuit stated:

> Hellgate suggested to C.B.'s parents that they obtain a general evaluation of C.B. at the September 22, 2003, IEP meeting. It referred C.B.'s parents to the CDC for general testing. Hellgate contends that, despite this recommendation, C.B.'s parents failed to procure an evaluation from the CDC after the September

---

[10] The Court will address whether the failure to implement speech/language services in the March 3, 2009 IEP constituted a denial of FAPE *infra* Section III.A.

2003 IEP meeting.  The fact that Hellgate referred
the parents to the CDC shows that Hellgate was
mindful that an evaluation was necessary.  Thus,
Hellgate's assertion that it did not suspect C.B.
had autism prior to the November 2003 IEP meeting,
because C.B.'s parents had not raised it at a
prior IEP meeting, is not supported by the record.
Hellgate failed to meet its obligation to evaluate
C.B. in all areas of suspected disabilities after
becoming aware of Dr. Gold's diagnosis.

Hellgate did not fulfill its statutory
obligations by simply referring C.B.'s parents to
the CDC.  Such an action does not "ensure that the
child is assessed," as required by 20 U.S.C.
§ 1414(b)(3)(C).  See also Union Sch. Dist. v.
Smith, 15 F.3d 1519, 1523 (9th Cir. 1994) (holding
that a parent's failure to secure an evaluation,
even if the parents agreed to obtain it, does not
excuse the school district's obligation under the
IDEA to secure such an evaluation).  In Union
School District, the parents of the student failed
to turn over portions of a report issued by a
specialist that may have been relevant to the
placement of the student.  Id.  The court held
that the "failure of the [parents] to turn over
portions of a specialist's report cannot excuse
the District's failure to procure the same
information for itself."  Id.

A school district cannot abdicate its
affirmative duties under the IDEA.  W.G. [v. Bd.
of Trs. of Target Range Sch. Dist. No. 23,
Missoula, Mont.], 960 F.2d [1479,] 1484-85 [(9th
Cir. 1992)]. . . .

541 F.3d 1202, 1209 (9th Cir. 2008) (some alterations in

original).

Defendant appears to suggest that the IEP team was

waiting for Mother to provide the Murphy-Hazzard Report to the

team after the March 3, 2009 IEP meeting, and this was one of the

reasons why the team did not act on Student's speech/language

issues until the formulation of the August 23, 2010 IEP.
[Answering Br. at 22.]  Pursuant to <u>Union School District</u> and
<u>N.B.</u>, however, the fact that Plaintiffs obtained the Murphy-
Hazzard Report did not absolve Defendant of its affirmative duty
to obtain information about Student's possible CAPD.  Further,
the Murphy-Hazzard Report, a neuropsychological evaluation,
merely provided evidence that CAPD was a suspected area of
disability.  Defendant ultimately had to send the Murphy-Hazzard
Report and the Iraha Report to an audiologist for review.  The
Court therefore CONCLUDES that the DOE violated its duty to
assess Student for CAPD until the IEP team sent the Murphy-
Hazzard Report with the Iraha Report to an audiologist to obtain
a recommendation regarding a CAPD assessment.

Although the failure to assess a student's suspected
disability is a procedural violation of the IDEA, not every
procedural violation constitutes a denial of FAPE.  <u>See</u> <u>L.M.</u>, 556
F.3d at 909.  Procedural violations that "result in the loss of
educational opportunity, or seriously infringe the parents'
opportunity to participate in the IEP formulation process,
clearly result in the denial of a FAPE."  <u>Id.</u> (citations and
quotation marks omitted).

Traciann Dolim, who worked with Student as the SSC,
testified that Dr. Takekawa, a DOE audiologist, reviewed the
Murphy-Hazzard Report and the Iraha Report and concluded that it

was not necessary for the DOE to assess Student for CAPD. [ROA, 7/27/11 Hrg. Trans. (Vol. III) at 427-28, 444.] Further, Plaintiffs' witness, Dr. Tyson, testified that "an auditory processing evaluation was conducted and did not find an Auditory Processing Disorder." [ROA, 7/26/11 Hrg. Trans. (Vol. II) at 267.] Dr. Tyson testified that, although Student does not have CAPD, he has "a mixed receptive-expressive language disorder," which concerns "the way the brain is encoding[,]" and requires intervention similar to an auditory processing problem. [Id. at 269-70.] Thus, this Court FINDS that, insofar as it was ultimately determined that Student does not have CAPD, the DOE's failure to assess Student's suspected CAPD after the March 3, 2009 IEP team meeting neither resulted in the loss of educational opportunity nor seriously infringed on his parents' right participation in the IEP formulation process.[11] The Court CONCLUDES that the DOE's failure to assess Student for CAPD did not result in the denial of FAPE.

The Court REVERSES the Hearings Officer's finding that Defendant had no duty to evaluate Student for CAPD after the March 3, 2009 IEP meeting, but the Court AFFIRMS the Hearings Officer's conclusion that the lack of a DOE CAPD evaluation did

---

[11] The DOE was already aware that Student needed speech/language services after the March 3, 2009 IEP team meeting. As previously noted, the Court will address whether the failure to implement speech/language services in the March 3, 2009 IEP constituted a denial of FAPE *infra* Section III.A.

not result in the denial of FAPE.

**B.** <u>**Mental Health/Behavioral Assessment**</u>

Plaintiffs argue that the Hearings Officer erred in finding that Defendant had no duty to evaluate Student for behavioral/mental health disabilities because Student did not manifest behavioral problems in the classroom. Plaintiffs contend that the Murphy-Hazzard Report and the concerns that Mother raised at the IEP meetings were sufficient to trigger the DOE's duty to assess Student for suspected behavioral/mental health disabilities. [Opening Br. at 21-22.]

As previously noted, § 1414(a)(2)(A) provides that an educational agency **shall** reevaluate a student if either the agency determines the student's needs warrant reevaluation or the student's parent or his teacher requests a reevaluation. There is no evidence in the record that Student's parents made a written request that the DOE reevaluate Student for behavioral/mental health disabilities or that any of his teachers requested such an evaluation. The Court must therefore determine whether there is any evidence in the record that Student's parents made an oral request for a behavioral/mental health evaluation or whether the information available to the DOE was sufficient to trigger the DOE's duty to evaluate Student for suspected behavioral/mental health disabilities.

Although she did not identify specific dates, Mother testified that, when she went to Student's IEP meetings, she raised "his shutting down, and . . . anxiety and self-esteem kind of things." [ROA, 7/26/11 Hrg. Trans. (Vol. II) at 353.] She would ask the team members if they observed Student shutting down because at home he shut down, and he was anxious and frustrated. [Id. at 359.] It is not clear from the record, however, whether Mother raised her concerns about Student's habit of shutting down as a behavioral/mental health issue or merely as a result of his speech and language difficulties. For example, Mother testified that, "every meeting I told them over and over, 'He needs speech. He's shutting down. He is not understanding. His grades are going further and further apart.'" [Id.] Specifically at the March 3, 2009 IEP team meeting, Mother raised Student's habit of shutting down in the context of his communication problems and his need for language services. [Id. at 363-64.]

Mother testified that, at the February 26, 2010 IEP team meeting, the team members agreed with Mother's reports of Student's problems with self-esteem and expressing himself, and they stated that they also saw it happen.[12] [Id. at 375.] This, however, does not necessarily rise to the level of recognizing a potential mental health disability. Mother believed that the

---

[12] For example, Mother testified that Ms. Otake, Student's fourth grade teacher, recognized that Student "had huge self-esteem issues." [ROA, 7/26/11 Hrg. Trans. (Vol. II) at 353.]

PLEPs in the February 26, 2010 IEP should have "something in [there] for mental health, the shutting down issues[,]" [id. at 376,] but she admitted that she did not tell the IEP team about her disagreement with the contents of the February 26, 2010 IEP [id. at 378-79]. Mother wrote a letter dated May 10, 2010 to the principal of the Home School stating that she disagreed with Student's IEP and requesting another meeting, but the letter did not identify specific concerns. [Id. at 380; Pets.' Exh. 9 at 130.] The team formulated the August 23, 2010 IEP after meetings on May 26, 2010, June 22, 2010, and August 23, 2010. [ROA, Pets.' Exh. 2 at 7.] At the hearing, Mother expressed concern about the fact that the August 23, 2010 IEP contained "nothing . . . regarding mental health." [ROA, 7/26/11 Hrg. Trans. (Vol. II) at 392.] She did not, however, testify that she specifically raised this concern to the IEP team. The Court therefore finds that there is no evidence in the record that Student's parents requested that the DOE evaluate Student for suspected behavioral/mental health disabilities.

Mother testified that she sent Student to Dr. Rochelle Hanson, a play therapist, for counseling for approximately one year. After about six months of counseling, Dr. Hanson referred them to Dr. Murphy-Hazzard because Dr. Hanson suspected that Student had ADHD, and Dr. Hanson had noticed Student's shutdowns and anxiety. [Id. at 360.] Plaintiffs, however, did not present

evaluations by Dr. Hanson or any other evidence of her diagnoses and treatment of Student. Mother informed Ms. Parish and Ms. Otake, Student's fourth grade special education and general education teachers, that Student was seeing Dr. Hanson and why he was seeing her, but Mother admitted that the DOE never received any records about Dr. Hanson's treatment of Student. [Id. at 410.]

Dr. Murphy-Hazzard did diagnose Student with a Generalized Anxiety Disorder, [ROA, Pets.' Exh. 7 at 00096,] but she linked Student's anxiety with his suspected auditory processing disorder and other language problems. For example, in discussing the results of Student's emotional evaluations, Dr. Murphy-Hazzard stated:

> [Mother] reported that [Student] is often afraid of the dark, noises, shadows, school performances, and new situations. He complains about psychosomatic symptoms (e.g. stomach aches, nausea, head aches) when faced with new situations and frequently tries to avoid these situations. She also noted that [Student] shuts down when he gets "stuck" on a problem. [Mother] reported these symptoms to have occurred since he was young and occurs across environments.
>
> These data were commensurate with observations taken during testing. [Student] frequently played with his ears when he was nervous, and he was reluctant to guess on questions or tasks that he unsure [sic] of. **It is not uncommon for children with auditory processing problems and/or learning disorders to experience a high degree of anxiety.**

[ROA, Pets.' Exh. 7 at 94 (emphasis added).]

42

Dr. Murphy-Hazzard also stated:

> Emotional measures were significant for a clinically diagnosable level of anxiety. Some of [Student's] behaviors present in a manner that may appear to be "malingering", or trying to get out of tasks or school days he wants to avoid. It is likely that, **while some of his behavior is normal childhood malingering, most of it arises from his difficulties with auditory processing and specific skills such as reading**. . . .

[Id. at 95 (emphasis added).]

Student's special education teacher for the third grade, Glorilyn Manding, testified that, in the classroom, Student did not exhibit any behaviors that concerned her or which she could not resolve through normal classroom interventions. She also testified that, in the classroom, Student did not exhibit the isolative and withdrawn behaviors described in the RIH. [ROA, 7/27/11 Hrg. Trans. (Vol. III) at 485-86, 491.] Ms. Parish and Ms. Otake also testified that Student did not exhibit isolative and withdrawn behaviors in the classroom. [Id. at 537, 576-77.] Dr. Bergeron testified that the school staff could make a justifiable conclusion that a student did not require mental health services, even if the staff did not have mental health training, because of their familiarity with how the student behaves in class. Dr. Bergeron also testified that it was possible for a student to require mental health services outside of school, although he did not need them during school. [ROA, 7/28/11 Hrg. Trans. (Vol. IV) at 630-31, 651, 644.]

Thus, the Court FINDS that, although Mother had concerns about Student's behavior, there is no evidence in the record that Plaintiffs requested a reevaluation for behavioral/mental health disabilities. The Court also FINDS that the information that was presented to the IEP team regarding possible behavioral/mental health issues indicated that Student's problematic behavior was the result of his speech/language difficulties. The Court therefore CONCLUDES that Defendant was not presented with enough information to trigger its duty to evaluate Student for suspected behavioral/mental health disabilities and Defendant's failure to assess Student for behavioral/mental health disabilities did not constitute a denial of FAPE.

## III. **Whether Student's IEPs Offered a FAPE**

Plaintiffs contend that all of the Contested IEPs failed to offer Student a FAPE because: the Contested IEPs did not address his communication needs; they did not address his behavioral/mental health needs; and because their goals and objectives were not appropriate for Student.

### A. **March 3, 2009 IEP**

As this Court previously noted, Defendant was aware, in light of the Iraha Report, that Student required speech/language services. The team stated that it was not implementing speech/language services because it was waiting for information

in the Murphy-Hazzard Report about Student's possible CAPD, but ultimately the evidence indicated that Student does not have CAPD and both Student's program at Loveland and the August 23, 2010 IEP included speech/language services without a CAPD diagnosis. Thus, the information in the Murphy-Hazzard Report about the CAPD rule-out was not necessary to the implementation of the speech/language services indicated by the Iraha Report and other information available when the team formulated the March 3, 2009 IEP. Even if testing had ultimately indicated that Student had CAPD, the DOE could have implemented speech/language services in the March 3, 2009 IEP based on the information in the Iraha Report and amended the services later based on subsequent information about CAPD. Insofar as the March 3, 2009 IEP did not include services that the DOE was aware Student needed, the March 3, 2009 IEP did not provide for an appropriate education for Student. The Court therefore CONCLUDES that the failure to provide speech/language services in Student's March 3, 2009 IEP constituted a denial of FAPE. See 20 U.S.C. § 1401(9)(C).

As to the alleged failure to include behavioral/mental health services in the March 3, 2009 IEP, this Court concludes that, for the same reasons that this Court has concluded that the available information did not trigger a duty to evaluate Student for suspected behavioral/mental health disabilities, Plaintiffs have not carried their burden of proving that failure to include

behavioral/mental health services in the March 3, 2009 IEP constituted a denial of FAPE.

Insofar as the March 3, 2009 IEP did not include the speech/language services that the IEP team determined Student needed, the IEP also failed to identify goals and objectives to address Student's speech/language deficits. The failure to address Student's speech/language needs also impaired his ability to accomplish his goal, and its associated objectives, regarding "attend[ing] to task in instructional setting on a daily basis." [ROA, Pets.' Exh. 4 at 00064.] The Court therefore CONCLUDES that the March 3, 2009 IEP also denied Student a FAPE because its goals and objectives failed to address his identified speech/language needs.

Plaintiffs have not presented sufficient evidence that Student's math goal and objective, [id. at 00063,] was inappropriate. The other three annual goals in the March 3, 2009 IEP related to reading and writing. In the third grade, Student came to Ms. Manding's class for language arts and math. [ROA, 7/27/11 Hrg. Trans. (Vol. III) at 481.] She testified that Student made progress in her class and that Student's IEP progress report showed that he was "progressing, for the most part." [Id. at 488-90; Resp.'s Exh. 11 (IEP Progress Report - IEP Date 03/03/09).] This indicated that Student's goals were appropriate because mastery of all of his goals would have

indicated that the goals and objectives were too low, and a rating of no progress on all of his goals would have indicated that they were inappropriate or too high.  [ROA, 7/27/11 Hrg. Trans. (Vol. III) at 490.]

Based on the preponderance of the evidence, the Court CONCLUDES that, with the exception of the failure to address Student's identified speech/language needs, the March 3, 2009 IEP offered Student a FAPE.

**B.    February 26, 2010 IEP**

As with the March 3, 2009 IEP, the Court also CONCLUDES that the February 26, 2010 IEP denied Student a FAPE because it failed to address Student's speech/language needs.  Further, for the reasons discussed, *supra*, the lack of behavioral/mental health services in the February 26, 2010 IEP did not constitute a denial of FAPE.

Three of the four annual goals in the February 26, 2010 IEP addressed reading and writing, and the fourth addressed math. [ROA, Pets.' Exh. 3 at 00041-44.]  The annual goals, and many of the objectives associated therewith, are the same as in the March 3, 2009 IEP.  Student's IEP progress report states that, as of May 26, 2010, Student had mastered his spelling objective and was progressing in all of his other objectives.  [ROA, Resp.'s Exh. 12 at 104-07.]  As with the March 3, 2009 IEP, Plaintiffs have not presented sufficient evidence that Student's math goal,

and its associated objectives, in the February 26, 2010 IEP, [ROA, Pets.' Exh. 3 at 00044,] was inappropriate.

As to Student's reading, the PLEPs in the February 26, 2010 IEP stated that his reading comprehension level increased from a 1.7 to a 3.0 grade level and his vocabulary comprehension was at a fourth grade level. [<u>Id.</u> at 38.] Further, the PLEPs identified areas where Student's spelling, grammar, and writing needed improvement, but they noted that he was "able to print legibly and use letter-sound knowledge and segmenting strategies to spell unfamiliar words" and "able to summarize a story at his instructional level." [<u>Id.</u>] Ms. Parish, Student's special education teacher for the fourth grade and a member of his IEP team, testified that Student was progressing and that his progress was one of the reasons he was not considered eligible for extended school year ("ESY") services. [ROA, 7/27/11 Hrg. Trans. (Vol. III) at 514.] Ms. Otake, Student's general education teacher for the fourth grade, stated that Student's progress in science and social studies was "slight" because of his reading level. [<u>Id.</u> at 573-74.]

The Court understands that Plaintiffs would have liked more services and more individualized attention, and that they were frustrated with the fact that Student did not make more progress. An IEP, however, need not conform to a parent's wishes in order to be sufficient or appropriate. <u>See</u> <u>Shaw v. District</u>

48

of Columbia, 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (stating that the IDEA does not provide for an "education . . . designed according to the parent's desires" (citation omitted)).

The Court notes that a FAPE need not provide the "absolutely best" or "potential-maximizing" education.  J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted).  The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit."  Id. at 433 (citations and quotation marks omitted).  Based on the preponderance of the evidence, the Court CONCLUDES that, with the exception of the failure to address Student's identified speech/language needs, the February 26, 2010 IEP offered Student a FAPE.

C.    **August 23, 2010 IEP**

Student's IEP team formulated the August 23, 2010 IEP after holding three meetings to address concerns that Mother raised after the formulation of the February 26, 2010 IEP.  The team amended the PLEP regarding communication from "Addressed but not a concern" in the February 26, 2010 IEP, [ROA, Pets.' Exh. 3 at 38,] to include the results of the tests cited in the Iraha Report as well as Student's communication needs [ROA, Pets.' Exh. 2 at 8-9, Exh. 8 at 1].  The August 23, 2010 IEP included five new annual goals regarding oral communication.  [ROA, Pets.' Exh.

49

2 at 15-19.]  It also added 1,200 minutes of special education services per week of ESY services after twenty-one days, as well as sixty minutes per week of speech/language therapy during the school year.  [Id. at 20.]  DOE speech and language pathologist Jeanne Iwashita testified that she attended the IEP team meetings on June 22 and August 23, 2010.  She was Christie Iraha's supervisor, and she attended the meetings because the team asked for a speech pathologist to address Student's communication concerns and Ms. Iraha was on leave at the time.  [ROA, 7/28/11 Hrg. Trans. (Vol. IV) at 604, 606-08.]  She testified that, based on the information available to the team, including the Iraha Report and the Murphy-Hazzard Report, the August 23, 2010 IEP appropriately addressed Student's speech/language needs.  [Id. at 607-11.]  Student's Speech Language Progress Report from Loveland states that Student "participates in group speech therapy with 4-5 of his peers . . . twice weekly for 30 minute sessions each week."  [ROA, Pets.' Exh. 16 at 224.]  Ms. Iwashita testified that the sixty-minutes of weekly speech/language services provided for in the August 23, 2010 IEP would have been provided in two sessions in a small group.  Thus, she testified that the services in the August 23, 2010 IEP were essentially the same as the services that Student received at Loveland during the 2010-2011 school year.  [ROA, 7/28/11 Hrg. Trans. (Vol. IV) at 620-21.]

Dr. Tyson acknowledged that the pull-out speech/language services that Student received at Loveland were the same as was offered in the August 23, 2010 IEP, but she asserted that sixty minutes was inadequate. [ROA, 7/26/11 Hrg. Trans. (Vol. II) at 278.] Mother testified that Loveland attended to Student's speech/language needs throughout his day, not just in the pull-out session. Mother admitted that she had not complained to Loveland about the amount of speech/language pull-out sessions Student was receiving, but she stated that, after hearing Dr. Tyson's testimony, she would ask for more services. [Id. at 416-17.]

The Hearings Officer concluded that "the amount of speech-language services in the August 23, 2010 IEP was sufficient to allow Student to achieve meaningful educational gain" and that Plaintiffs had not proven that the services offered in the August 23, 2010 IEP were inappropriate. [Decision at 23.] This Court agrees that the additions to the August 23, 2010 IEP assessing Student's speech/language needs were appropriate, and this Court agrees that the DOE's offer of a FAPE relating to Student's programs and placement in the August 23, 2010 IEP were designed to allow Student to achieve meaningful educational gains in the least restrictive environment. The Court is sympathetic to Parents' view that Student made remarkable progress at Loveland. The IDEA, however, does not

require states to "maximize each child's potential commensurate with the opportunity provided other children," but only to "enable the child to receive educational benefits." <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 198, 207 (1982) (footnote omitted).

The Court notes that, throughout the proceedings, Parents have sought, as all good parents do, to secure the best services for their child. Student's progress at Loveland is commendable, but the role of the district court in IDEA appeals is not to determine whether an educational agency offered the best services available. Further, while the parties appear divided by honest differences of opinion about the progress that Student made while at the Home School, the Court finds compelling evidence that the August 23, 2010 IEP was tailored to meet Student's specific needs. Based on the preponderance of the evidence, the Court therefore CONCLUDES that the August 23, 2010 IEP offered Student a FAPE in compliance with the IDEA.

## IV. <u>Remedies for the Denial of FAPE</u>

This Court has concluded that: the March 3, 2009 IEP and the February 26, 2010 IEP denied Student a FAPE because they did not address his speech/language needs, even though the IEP team determined that Student was entitled to receive speech/language services; but the August 23, 2010 IEP did offer Student a FAPE. Insofar as the DOE's proposed placement of

Student at the Home School for the 2010-2011 school year did not violate the IDEA, Plaintiffs are not entitled to reimbursement for Student's expenses at Loveland.  See Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 246 (2009) ("Parents are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act." (citation and quotation marks omitted)).  The Court therefore DENIES Plaintiffs' request for reimbursement for the expenses of Student's placement at Loveland.

The Court, however, finds that Defendant's failure to address Student's speech/language needs in the March 3, 2009 IEP and the February 26, 2010 IEP resulted in a loss of educational benefits to Student.  "[C]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide FAPE to a student."  Dep't of Educ. v. Zachary B. ex rel. Jennifer B., Civ. No. 08-00499 JMS/LEK, 2009 WL 1585816, at *9 (D. Hawai`i June 5, 2009).  The Ninth Circuit has explained that:

> Compensatory education services can be awarded as appropriate equitable relief.  20 U.S.C. § 1415(i)(2)(B)(iii) ("shall grant such relief as the court determines appropriate"); Parents of Student W. v. Puyallup Sch. Dist., 31 F.3d 1489, 1496-97 (9th Cir. 1994).  Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the

53

> [Individuals with Disabilities Education Act].
> The courts have discretion on how to craft the
> relief and "[t]here is no obligation to provide a
> day-for-day compensation for time missed."  We
> review the Hearing Officer's and the district
> court's award of compensatory education services
> for abuse of discretion.

Park ex rel. Park v. Anaheim Union High Sch. Dist., 464 F.3d

1025, 1033 (9th Cir. 2006) (some citations and quotation marks

omitted).

The Court CONCLUDES that compensatory education is the

appropriate relief for Defendant's failure to provide Student

with speech/language services from the March 3, 2009 IEP to the

August 23, 2010 IEP.  The Court, however, ORDERS the parties to

submit supplemental briefing, with supporting citations to the

record on appeal, addressing the issue of what specific type of

compensatory education the Court should award.  Plaintiffs shall

file their supplemental brief by **August 14, 2012**, and Defendant

shall file its supplemental brief by **August 28, 2012**.  Each

supplemental brief shall not exceed ten pages.

The Court emphasizes that the parties must limit their

supplemental briefs to the issue of what compensatory education

the Court should order as a remedy for Defendant's failure to

address Student's speech/language needs in the March 3, 2009 IEP

and in the August 23, 2010 IEP.  The parties may not use the

supplemental briefs to relitigate the issue whether there was a

denial of FAPE, whether Plaintiffs' are entitled to reimbursement

of Student's tuition and expenses at Loveland, or any other issue addressed in the instant Order.

## V. <u>Reimbursement for the Tyson Evaluation</u>

In the conclusion of their Opening Brief, Plaintiffs argue that the Court should vacate the Decision, enter judgment in Plaintiffs' favor and order Defendant to, *inter alia*, "reimburse Plaintiff for the cost of evaluations conducted by Drs. [sic] Murphy-Hazzard and Dr. Tyson pursuant to 34 C.F.R. § 300.502[.]" [Opening Brief at 36.] First, Plaintiffs' Opening Brief does not include any substantive discussion regarding this request. Moreover, Dr. Tyson tested Student in November 2010 and completed her evaluation after Student was enrolled at Loveland Academy and without Plaintiffs requesting an IEE. <u>See</u> 34 C.F.R. § 300.502(b)(2). The Court therefore CONCLUDES that Plaintiffs are not entitled to reimbursement for the cost of Dr. Tyson's evaluation. Plaintiffs' request for reimbursement pursuant to § 300.502 is DENIED.

## <u>CONCLUSION</u>

On the basis of the foregoing, the Hearings Officer's Findings of Fact, Conclusions of Law and Decision, filed October 6, 2011, is HEREBY AFFIRMED IN PART AND VACATED IN PART. The Court VACATES the Hearings Officer's Decision to the extent that:

1) the Court CONCLUDES that Defendant violated the IDEA by failing to evaluate Student for CAPD after the March 3, 2009

IEP team meeting, but the Court also CONCLUDES that the violation did not result in a denial of FAPE because the evidence ultimately established that Student did not have CAPD;

2) the Court CONCLUDES that the failure to address Student's speech/language needs, both in the provision of services and in the creation of a appropriate goals and objectives, in the March 3, 2009 IEP and in the June 26, 2010 IEP constituted a denial of FAPE; and

3) the Court CONCLUDES that compensatory education is the appropriate relief for the denial of FAPE.

The Court AFFIRMS the Decision in all other respects.

The Court ORDERS the parties to file supplemental briefing on the issue of the form of compensatory education that is appropriate in this case. Plaintiffs shall file their supplemental brief by **August 14, 2012**, and Defendant shall file its supplemental brief by **August 28, 2012**.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, July 30, 2012.



/S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**I.T., ET AL. V. DEPARTMENT OF EDUCATION, STATE OF HAWAII; CIVIL NO. 11-00676 LEK-KSC; ORDER AFFIRMING IN PART AND VACATING IN PART THE HEARINGS OFFICER'S OCTOBER 6, 2011 DECISION**